**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| **IN RE:** | **CASE NO.  21-30346** |
| **CAROL S WAGGENER** | **CHAPTER 7** |
| **DEBTOR** | |

*If the debtor has been negatively impacted by COVID-19, the debtor may contact Wells Fargo Home Mortgage to discuss a personalized solution at 1-800-274-7025. Written attorney consent may be required to speak directly with the debtor about these options.*

**MOTION FOR RELIEF FROM AUTOMATIC STAY (REAL PROPERTY)**
**OR IN THE ALTERNATIVE ADEQUATE PROTECTION**

Wells Fargo Bank, N.A. ("Creditor"), a secured creditor in the above-captioned case, hereby moves this Court, pursuant to 11 U.S.C. § 362, for relief from the automatic stay or in the alternative for adequate protection with respect to certain property having an address of 128 Wonderwood Drive, Charlotte, North Carolina 28211 (the "Property"), for all purposes allowed by the Note (defined below), the Deed of Trust (defined below), and applicable law, including but not limited to the right to foreclose. In further support of this Motion, Creditor respectfully states:

1.      On or about June 8, 2021 (the "Petition Date"), CAROL S WAGGENER (the "Debtor"), filed a petition under Chapter 7 of Title 11 of the U.S. Code.

2.      This Court has jurisdiction to hear this matter and enter a final order pursuant to 28 U.S.C. §§ 157 and 1334; and 11 U.S.C. § 362.

3.      On or about January 7, 2016, Carol Waggener executed that certain Note in the original principal amount of $125,000.00 (the "Note"). A copy of the Note is attached hereto as Exhibit "A."

4.      Pursuant to that certain Deed of Trust recorded in the Mecklenburg County, NC Register of Deeds in Book 30546 at Page 120 (the "Deed of Trust"), all amounts owed under and with respect to the Note (the "Obligation") are secured by the Property. A copy of the Deed of Trust is attached hereto as Exhibit "B."

5.      Wells Fargo Home Equity Group services the Obligation. In the event the automatic stay is modified, this case dismisses, and/or the Debtor(s) obtain(s) a discharge and a foreclosure action is commenced on the Property, the foreclosure will be conducted in the name of Wells Fargo Bank, N.A. Creditor is the original mortgagee or beneficiary or the assignee of the security instrument for the referenced loan. Creditor, directly or through an agent, has possession of the Note.

6.      Upon information and belief, the Property is being surrendered.

7.      The estimated market value of the Property is $418,000.00.  The basis for such valuation is Schedule A/B.

8.      Upon information and belief, the payoff amount as of August 19, 2021 is $121,439.86. According to Debtor's Schedule D, there are additional liens on the property in the aggregate amount of $766,091.42.

9.      Cause exists for relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) because Creditor's interest in the Property is not adequately protected. Pursuant to § 362(d)(2), the Debtor do not have any equity in the Property and the Property is not necessary for an effective reorganization.

WHEREFORE, Creditor prays that this Court issue an Order terminating or modifying the stay and granting the following:

1.      Relief from the stay for all purposes allowed by the Note, the Deed of Trust, and applicable law, including but not limited to allowing Creditor (and any successors or assigns) to proceed under applicable non-bankruptcy law to enforce its remedies to foreclose upon and obtain possession of the Property and any and all other collateral pledged under the Deed of Trust.

2.      That the 14-day stay described by Bankruptcy Rule 4001(a)(3) be waived.

3.       Creditor specifically requests permission to communicate with the Debtor and Debtor's counsel to the extent necessary to comply with applicable non-bankruptcy law.

4.      In the alternative, Creditor requests that this Court enter an order providing Creditor with adequate protection of its interests in the Property.

5.      For such other relief as the Court deems proper.

This is the 23rd day of August, 2021.

*/s/ Neil D Jonas*
Neil D Jonas
(Bar No. 31622)
Attorney for Creditor
BROCK & SCOTT, PLLC
8757 Red Oak Blvd., Suite 150
Charlotte, NC 28217
Telephone:  704-369-0676
Facsimile:  704-359-0760
E-Mail:  ncbkr@brockandscott.com

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| **IN RE:** | **CASE NO.  21-30346** |
| **CAROL S WAGGENER** | **CHAPTER 7** |
| **DEBTOR** | |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies under penalty of perjury that he/she is over eighteen (18) years of age and that the MOTION FOR RELIEF FROM AUTOMATIC STAY AND NOTICE OF MOTION in the above captioned case were this day served upon the below named persons by mailing, postage prepaid, first class mail a copy of such instrument to each person(s), parties, and/or counsel at the addresses shown below:

CAROL S WAGGENER
128 WONDERWOOD DRIVE
CHARLOTTE, NC 28211

ANNA S. GORMAN
GRIER WRIGHT MARTINEZ, PA
521 E. MOREHEAD ST.
SUITE 440
CHARLOTTE, NC 28202

A. BURTON SHUFORD
4700 LEBANON ROAD,
SUITE #A-2
MINT HILL, NC 28227

This is the ___25th___ day of ___August___, 2021.

_/s/ Neil D Jonas_
Neil D Jonas
(Bar No. 31622)
Attorney for Creditor
BROCK & SCOTT, PLLC
8757 Red Oak Blvd., Suite 150
Charlotte, NC 28217
Telephone:  704-369-0676
Facsimile:  704-359-0760
E-Mail:  ncbkr@brockandscott.com

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| IN RE:<br>**CAROL S WAGGENER**<br>                       **DEBTOR** | **CASE NO.  21-30346**<br>**CHAPTER 7** |

### NOTICE OF MOTION AND OPPORTUNITY FOR HEARING
{No Protest Motion Pursuant to 11 U.S.C. § 362}

### TO THE DEBTOR, DEBTOR'S ATTORNEY, TRUSTEE AND ALL PARTIES IN INTEREST

**THIS NOTICE IS HEREBY GIVEN** of a Motion for Relief from Automatic Stay filed simultaneously herewith in the above-captioned case, a copy of which is attached to herein, and;

**NOTICE IS FURTHER GIVEN** that this motion may be allowed pursuant to U.S.C. § 362(e) without a hearing or further notice provided no response and request for a hearing is made by the parties in interest in writing to the **U.S. Bankruptcy Court Clerk of Court at North Carolina - Western - Charlotte, 401 West Trade Street Room 111, Charlotte, NC 28202** within FOURTEEN (14) DAYS from the date of this notice, and;

**NOTICE IS FURTHER GIVEN** that if a response and request for a hearing is filed by a party in interest named herein, in writing within the time indicated, a hearing will be conducted in the **Charlotte Division of the U.S. Bankruptcy Court Western District of North Carolina, located North Carolina - Western - Charlotte, 401 West Trade Street, JCW Courtroom 2B, Charlotte, NC 28202 on**   September 27, 2021   **, at**   9:30 A.M.   **.** If no response for a hearing is timely filed, this Court may rule on the Motion exparte without further notice. Any party requesting a hearing shall appear at the hearing in support of such an objection or may be assessed with costs of Court.

This is the   25th   day of   August   , 2021.

*/s/ Neil D Jonas*
Neil D Jonas
(Bar No. 31622)
Attorney for Creditor
BROCK & SCOTT, PLLC
8757 Red Oak Blvd., Suite 150
Charlotte, NC 28217
Telephone:  704-369-0676
Facsimile:  704-359-0760
E-Mail:  ncbkr@brockandscott.com

# EXHIBIT "A"

**WELLS FARGO BANK, N.A.**

**AGREEMENT DATE:   01/07/2016**
**ACCOUNT #:**
**REFERENCE #:**

---

## *Wells Fargo Home Equity Account* Agreement and Disclosure Statement (the "Agreement")

---

Borrower Name:
**CAROL WAGGENER,**

Property Address:
**128 WONDERWOOD DRIVE, CHARLOTTE, NC 28211**

Mailing Address for Billing Purposes (if different):
**128 WONDERWOOD DR, CHARLOTTE, NC 28211-4010**

Credit Line Limit:
**$125,000.00**

Prep - 311

JAN 14 2016

HE - BIL

## SECTION 1:  MY ACCOUNT AGREEMENT

In this Agreement, the words, "I," "me," "my," and "Borrower" (which also means "we," "us," "our," and "Borrowers," if more than one customer signs below) refer to each person who signs this Agreement. The words "you," "your," "Lender," and "the Bank" refer to Wells Fargo Bank, N.A. and any successor or assign or subsequent holder of this Agreement. This Agreement governs my *Wells Fargo Home Equity Account* (the "Account") with the Bank. If more than one person signs this Agreement, we are jointly and individually bound by its terms. We are separately liable to the Bank for the entire amount owed on the Account. We are each liable as a principal and not merely as a guarantor, even if one or more of us does not use the Account.

## SECTION 2:  SECURITY INTEREST

I am giving the Bank a deed of trust, mortgage or other security instrument including all modifications, addenda and amendments thereto (the "Security Instrument"), signed the same date as this Agreement. The Security Instrument gives you a security interest in the property located at the address shown above (the "Property").

## SECTION 3: MY *WELLS FARGO HOME EQUITY ACCOUNT*

My Account is a revolving account. My credit limit is shown above and will be displayed on each of my billing statements. During the Draw Period (described below), my available credit will be my credit limit minus the sum of all unpaid Advances posted to my Account. During the Draw Period, as I repay the principal balance I owe on my Account, my available credit will be replenished. I agree not to request an Advance that would cause my balance to exceed my credit limit. If at any time the balance of my Account exceeds my credit limit, I agree to immediately repay the amount that exceeds my credit limit. I may not obtain new Advances after the Draw Period ends. At that time, I will begin the Repayment Period described in Section 5 below.

I may apply for an increase in my credit limit, and if I do so I agree to pay any application, appraisal and other fees, including increased costs for title insurance, as the Bank may require. If the Bank approves my application and increases my credit limit, I will provide and maintain such additional hazard insurance (including flood insurance, if necessary) and sign any additional documents as the Bank may require. All such increased credit amounts will be governed by the terms and conditions of this Agreement and will be secured by the Security Instrument.

The Bank may from time to time in its sole discretion, approve additional credit for me under the terms of this Agreement. I will receive written notice from the Bank of any such offer to increase my credit limit. I may accept such offer of increased credit by my use of those additional funds and by signing any additional documents the Bank may require. All such increased credit amounts will be governed by the terms and conditions of this Agreement and will be secured by the Security Instrument.

## SECTION 4: MY ACCOUNT DURING THE DRAW PERIOD

### DRAW PERIOD

I may request Advances during the Draw Period. My Account has a Draw Period of 10 years and one month from the date this Agreement is effective. This Agreement is considered effective on the day the last of us signs this Agreement (the "Effective Date"). I may not obtain Advances after the Draw Period ends.

When the Draw Period ends, the outstanding unpaid Line of Credit Advances must be repaid according to the repayment terms as detailed below in Section 5, MY ACCOUNT DURING THE REPAYMENT PERIOD.

### ADVANCES DURING THE DRAW PERIOD

There are 2 types of Advances on my Account:

- Line of Credit Advances
- Fixed Rate Advances

The Bank must honor my request for Line of Credit Advances and Fixed Rate Advances (collectively, "Advances") as long as I am in compliance with all terms of this Agreement, including all modifications, addenda and amendments to it, and the Security Instrument.

As I use my Account, my available credit will be my credit limit minus the sum of all unpaid Advances. As I repay the principal balance I owe on my Account, my available credit will be replenished. I will not request an Advance that would cause the balance in my Account to exceed my credit limit, or which would violate the terms of this Agreement or any law. If I do exceed my credit limit, I agree to immediately repay the amount that exceeds my credit limit.

I understand that the Bank may refuse to allow any Advance if the Advance does not comply with every requirement of this Agreement. The Bank may choose at its sole discretion to make an Advance that does not comply. The Bank may allow any Advances in any sequence convenient to the Bank.

The Bank is authorized to make an Advance from my Account when it receives a request given by any person who has signed this Agreement. If there are conflicting demands made by any of us who signed this Agreement, the Bank has the option to refuse to make any Advance that has not been requested by all of us together. The Bank will not be liable for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request, when the Bank acts upon such instructions believing them to be genuine.

I agree that I will be the only user of my Account, and I will not provide the Advance request checks, access cards, etc., to any other person. I agree to provide true, accurate, current and complete information about myself as requested and I agree to not misrepresent my identity. Further, I will safeguard my Account number, periodic statements, and any passwords and other confidential Account information. I agree to immediately notify the Bank at the phone number shown on my monthly billing statement to report any actual or suspected unauthorized use of myAccount. Please refer to section 23 for additional information on handling unauthorized transactions on Advance request checks.

## LINE OF CREDIT ADVANCES

Each Line of Credit Advance I request will be in the amount of $300 or greater.

## LINE OF CREDIT ADVANCE METHODS

While my Account is not in default, closed, or suspended, I may obtain a Line of Credit Advance by:

> Requesting a Line of Credit Advance in person at any Bank branch
> Requesting a Line of Credit Advance by phone
> Transferring funds by using Wells Fargo Online®
> In other ways the Bank authorizes from time to time
> Writing an Advance request check or draft which the Bank has provided to me
> Obtaining a cash withdrawal or transferring funds by using my Wells Fargo ATM Card or Wells Fargo ATM & Check Card, if offered by the Bank and I select such service
> Using my home equity access credit card, if offered by the Bank and I select such service

## LINE OF CREDIT ADVANCES PERIODIC FINANCE CHARGES

Finance charges begin to accrue on Line of Credit Advances immediately when funds are advanced. The periodic FINANCE CHARGE for a billing cycle is the sum of the periodic FINANCE CHARGE for each day in the billing cycle. To determine the periodic FINANCE CHARGE for a day in the billing cycle, multiply the Daily Periodic Rate by the daily balance for Line of Credit Advances (including current transactions) each day. To determine the daily balance, take the Line of Credit Advances balance at the beginning of each day (excluding any unpaid FINANCE CHARGES or other charges provided for under this Agreement), add any new Line of Credit Advances, and subtract any payments or credits that apply to the repayment of Line of Credit Advances. The result is the daily balance.

The Daily Periodic Rate for Line of Credit Advances is equal to 1/365 (1/366 during leap years) of an Index plus a Margin. The Index is the highest Prime Rate as published in the Western Edition of *The Wall Street Journal* "Money Rates" table. The Margin, the initial Daily Periodic Rate, and the initial ANNUAL PERCENTAGE RATE, are each disclosed below. The ANNUAL PERCENTAGE RATE does not include costs other than interest.

The Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE on my Line of Credit Advances will be adjusted the day after an Index change is published, using the new Index value. Therefore, the Daily Periodic Rate for Line of Credit Advances may change (increase or decrease) as often as once each day based on changes in the Index. I understand that any increase may cause me to make larger monthly payments.

## LIFETIME RATE CAP FOR LINE OF CREDIT ADVANCES

The Lifetime Rate Cap for Line of Credit Advances will never exceed the lesser of 18% or SEVEN AND ZERO THOUSANDTH percentage points (7.000%) above my initial annual percentage rate for Line of Credit Advances. My Lifetime Rate Cap for my Line of Credit Advances will never exceed an Annual Percentage Rate of 10.750% (corresponding Daily Periodic Rate of 0.029372%).

## ANNUAL RATE CAP FOR LINE OF CREDIT ADVANCES

My Account has an Annual Rate Cap for Line of Credit Advances. For purposes of the Annual Rate Cap, the first "year" will begin on the Effective Date. Subsequent years will begin on each anniversary of the Effective Date. During each year, I am protected from **ANNUAL PERCENTAGE RATE** increases due to increases in the Index (but I am not protected from other rate changes, as described below) of more than TWO AND ZERO THOUSANDTH percentage points (2.000%) that occur in a given year, in that the **ANNUAL PERCENTAGE RATE** for Line of Credit Advances will not increase by more than TWO AND ZERO THOUSANDTH percentage points (2.000%) from the **ANNUAL PERCENTAGE RATE** in effect on the last day of the prior year. This is the Annual Rate Cap for Line of Credit Advances. I understand that at the beginning of each year, you may raise the **ANNUAL PERCENTAGE RATE** to reflect the then current Index plus my Margin, subject to the Annual Rate Cap and applicable law, even if the Index is unchanged or has decreased. Other Rate Changes: My Annual Rate Cap applies only to changes to the **ANNUAL PERCENTAGE RATE** due to Index changes; the Annual Rate Cap does not apply to other types of **ANNUAL PERCENTAGE RATE** changes, if applicable, including but not limited to rate changes due to modifications or rate changes upon the expiration of a promotional rate period, in which case my **ANNUAL PERCENTAGE RATE** may increase more than TWO AND ZERO THOUSANDTH percentage points (2.000%) in a given year.

## LIFETIME RATE FLOOR FOR LINE OF CREDIT ADVANCES

The Daily Periodic Rate for Line of Credit Advances will never fall below 0.002732% (corresponding **ANNUAL PERCENTAGE RATE** of 1.000%). This is the Lifetime Rate Floor for Line of Credit Advances.

## MY INITIAL RATE FOR LINE OF CREDIT ADVANCES

As discussed above, my Daily Periodic Rate is based on the value of the Index plus a Margin. The initial Index value that applies to my Account will be the value of the Index on the day I open my Account. The following disclosures are based on the value of the Index in effect on January 05, 2016. I understand that if I open my Account after this date, my actual Index value, Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE may be higher or lower than the rates disclosed below. This rate takes into account any discounts for which I am eligible and I have chosen, and which will continue to apply during my repayment period unless I choose the option of the One Time Request to Convert to a Fixed Rate.

My Margin for Line of Credit Advances is equal to ZERO AND TWO HUNDRED FIFTY THOUSANDTH percentage points (0.250%). As a result, my initial Daily Periodic Rate is 0.010246% (corresponding **ANNUAL PERCENTAGE RATE** of 3.750%).

## LINE OF CREDIT ADVANCES MINIMUM MONTHLY PAYMENT

During the Draw Period, my Minimum Monthly Payment for Line of Credit Advances shall be equal to:

**Amortizing Payment:** My Minimum Monthly Payment for Line of Credit Advances will include both principal and interest. My Minimum Monthly Payment will be equal to the amount calculated by determining substantially equal, fully amortizing payments sufficient to repay the outstanding Line of Credit Advances balance on the last day of the billing cycle over a term equal to the number of months remaining in the Draw Period plus two hundred and forty (240) months at the ANNUAL PERCENTAGE RATE in effect on the last day of the billing cycle. My Minimum Monthly Payment will never be less than the sum of all accrued and unpaid periodic FINANCE CHARGES on Line of Credit Advances. My Minimum Monthly Payment will change each month based on the outstanding Line of Credit Advances balance and applicable ANNUAL PERCENTAGE RATE in accordance with this Agreement. My Minimum Monthly Payment will never be less than the lesser of $100 or the amount sufficient to repay the Line of Credit Advances balance plus accrued periodic FINANCE CHARGES.

## FIXED RATE ADVANCES DURING THE DRAW PERIOD

I have the option to convert outstanding unpaid Line of Credit Advances to Fixed Rate Advances during the Draw Period based on credit limit availability. The minimum Fixed Rate Advance during the Draw Period is $10,000. I may request up to 2 Fixed Rate Advances each year. For purposes of this rule, the first "year" will begin on the Effective Date. Subsequent years will begin on each anniversary of the Effective Date. I may have no more than 3 Fixed Rate Advances outstanding at any one time. On the Effective Date, I may request an initial Fixed Rate Advance in an amount that does not exceed my available credit. After the Effective Date, the sum of all outstanding Fixed Rate Advances taken after the Effective Date may not exceed the lesser of my available credit or $250000.00. I must select the repayment term for the Fixed Rate Advance at the time I request the Fixed Rate Advance.

**Fully Amortizing Payments:**

For a Fixed Rate Advance with fully amortizing payments during the Draw Period (see the section below titled "**FIXED RATE ADVANCES MINIMUM MONTHLY PAYMENT DURING THE DRAW PERIOD**"), the repayment term must be a period of whole years and in the range described below:

| Fixed Rate Advance Amount | Term Range |
|---|---|
| $10,000 - 19,999.99 | 5 to 15 years |
| $20,000 and above | 5 to 20 years |

**Partially Amortizing Payments:**

For a Fixed Rate Advance with the partially amortizing payments during the Draw Period (see the section below titled **"FIXED RATE ADVANCES MINIMUM MONTHLY PAYMENT DURING THE DRAW PERIOD"**), the repayment term must be at least one year and not more than the lesser of 5 years or the remaining term of the Draw Period minus one month. At the end of the term, the balance will convert to a Line of Credit Advance.

## FIXED RATE ADVANCE METHODS DURING THE DRAW PERIOD

While my Account is not in default, closed, or suspended, I may obtain a Fixed Rate Advance by:
- Requesting a Fixed Rate Advance in person at any Bank branch.
- Requesting a Fixed Rate Advance by phone.

## TERMINATION OF FIXED RATE ADVANCES BY BORROWER DURING THE DRAW PERIOD

During the Draw Period, while my Account is not in default, closed, or suspended, and as the Bank may allow, I may request that the Bank terminate any Fixed Rate Advance by sending you signed, written instructions to the Correspondence Address indicated on my billing statement. When the Fixed Rate Advance has been terminated, the outstanding balance of the Fixed Rate Advance will be added back to any Line of Credit Advances, and FINANCE CHARGES will accrue at the variable ANNUAL PERCENTAGE RATE described in the Agreement for Line of Credit Advances. Once a Fixed Rate Advance is terminated, I will not be able to reinstate the Fixed Rate Advance under the previous terms.

## FIXED RATE ADVANCES PERIODIC FINANCE CHARGES DURING THE DRAW PERIOD

Fixed Rate Advances will accrue periodic FINANCE CHARGES beginning on the day that the Bank converts any Line of Credit Advances to a Fixed Rate Advance. I will be charged a periodic FINANCE CHARGE on all outstanding unpaid Fixed Rate Advances each day at a fixed Daily Periodic Rate. To determine the periodic FINANCE CHARGE for a day in the billing cycle, multiply the Daily Periodic Rate by the daily balance for the Fixed Rate Advance (including current transactions) each day. To determine the daily balance for the Fixed Rate Advance, take the Fixed Rate Advance balance at the beginning of each day (excluding any unpaid FINANCE CHARGES or other charges provided for under this Agreement), and subtract any payments or credits that apply to the repayment of the Fixed Rate Advance. The result is the daily balance.

The Daily Periodic Rate for Fixed Rate Advances (other than any initial Fixed Rate Advance that I request on the Effective Date) is equal to 1/365 (1/366 during leap years) of an Index plus a Margin. The Index is the highest Prime Rate as published in the Western Edition of *The Wall Street Journal* "Money Rates" table. The Bank will use the value of the Index in effect on the last business day preceding the day the Bank receives my request for a Fixed Rate Advance. The Margin for Fixed Rate Advances is eight percentage points (8.000%), but the Margin may be lower than eight percentage points (8.000%) depending upon the amount and term of the Fixed Rate Advance and other pricing indicators that exist at the time we receive your request for a Fixed Rate Advance.

The corresponding ANNUAL PERCENTAGE RATE for Fixed Rate Advances will never be more than the Lifetime Rate Cap for Fixed Rate Advances shown below. The ANNUAL PERCENTAGE RATE does not include costs other than interest.

## LIFETIME RATE CAP FOR FIXED RATE ADVANCES DURING THE DRAW PERIOD

The Daily Periodic Rate for Fixed Rate Advances will not exceed 0.029372% (corresponding **ANNUAL PERCENTAGE RATE** of 10.750%). This is the Lifetime Rate Cap for my Final Fixed Rate Advances.

## INITIAL FIXED RATE ADVANCE

I did not request an initial Fixed Rate Advance on the Effective Date.

## FIXED RATE ADVANCES MINIMUM MONTHLY PAYMENT DURING THE DRAW PERIOD

The following minimum payment options will apply to a Fixed Rate Advance during the Draw Period:

**Fully Amortizing Payments:** Under this option, my Minimum Monthly Payment for the Fixed Rate Advance will be equal to the amount of principal plus periodic FINANCE CHARGE sufficient to repay the Fixed Rate Advance within its applicable term in substantially equal, fully amortizing monthly payments at the applicable corresponding ANNUAL PERCENTAGE RATE. This assumes that all payments will be made on their due dates, which will be the same as the due dates for my Line of Credit Advances Minimum Monthly Payment described above. If my payments are not consistently made when due, the Fixed Rate Advance Minimum Monthly Payment may not fully repay the Fixed Rate Advance over its term and my final payment may be higher.

**Partially Amortizing Payments:** Under this option my Minimum Monthly Payment for the Fixed Rate Advance will be equal to the amount calculated based on principal plus periodic Finance Charges and calculating substantially equal monthly payments sufficient to repay the Fixed Rate Advance over a term equal to the number of months remaining in the Draw Period plus two hundred and forty (240) months at the applicable ANNUAL PERCENTAGE RATE. The minimum payment will not fully repay the outstanding principal within the term I have selected for the Fixed Rate Advance. At the end of the term, the balance will no longer be subject to a fixed rate and will convert to a Line of Credit Advance.

During the Draw Period, my available credit for new Line of Credit Advances will be replenished by the amount of principal I repay on my Fixed Rate Advances.

## MY TOTAL PAYMENT DUE DURING THE DRAW PERIOD

I will receive monthly billing statements from the Bank. I must pay at least the amount of the Total Payment Due by the Date Due, as shown on each monthly billing statement.

The "Total Payment Due" during the Draw Period consists of my Line of Credit Advances Minimum Monthly Payment plus my Fixed Rate Advance Minimum Monthly Payment(s) together with all past due amounts, overlimit amounts and all other charges due.

## SECTION 5: MY ACCOUNT DURING THE REPAYMENT PERIOD

### REPAYMENT PERIOD

I understand that I may not receive new Advances after the Draw Period ends. At that time, I will begin the Repayment Period, which will continue for 20 years after the end of the Draw Period.

### REPAYMENT OF OUTSTANDING FIXED RATE ADVANCES

During the Repayment Period, I will continue to make the same Fixed Rate Advance Minimum Monthly Payment for any Fixed Rate Advance that was in effect at the end of the Draw Period. If my payments are not consistently made when due, the Fixed Rate Advance Minimum Monthly Payment may not fully repay the Fixed Rate Advance over its term and my final payment may be higher.

### REPAYMENT OF LINE OF CREDIT ADVANCES BALANCE

At the end of the Draw Period, my outstanding unpaid Line of Credit Advances balance must be repaid over the Repayment Period. The Repayment Period will have a term of 20 years.

The Line of Credit Advances Balance Minimum Monthly Payment will be the greater of $100 or an amount sufficient to repay the unpaid Line of Credit Advances balance by the end of the 20-year term in substantially equal, fully amortizing monthly payments of principal and periodic FINANCE CHARGE at the applicable corresponding ANNUAL PERCENTAGE RATE. If my payments are not consistently made when due, the Line of Credit Advances Balance Minimum Monthly Payment may not fully repay the unpaid Line of Credit Advances balance over its term and my final payment for the unpaid Line of Credit Advances balance may be higher. The Bank will notify me in advance of any changes to my Total Payment Due as a result of the Line of Credit Advances Balance Minimum Monthly Payment.

## PERIODIC FINANCE CHARGE ON LINE OF CREDIT ADVANCES BALANCE

Periodic FINANCE CHARGES on my unpaid Line of Credit Advances balance will continue to accrue at a variable rate during the Repayment Period according to the terms described above in Section 4, LINE OF CREDIT ADVANCES PERIODIC FINANCE CHARGES, LIFETIME RATE CAP FOR LINE OF CREDIT ADVANCES, ANNUAL RATE CAP FOR LINE OF CREDIT ADVANCES, and LIFETIME RATE FLOOR FOR LINE OF CREDIT ADVANCES.

## ONE TIME REQUEST TO CONVERT TO A FIXED RATE

During the Repayment Period, I may make a one time request to convert my rate for the unpaid Line of Credit Advances balance from a variable rate as described above to a fixed Daily Periodic Rate. Any such fixed Daily Periodic Rate will be equal to 1/365 (1/366 during leap years) of an Index plus a Margin. The Index is the highest Prime Rate as published in the Western Edition of *The Wall Street Journal* "Money Rates" table. The Bank will use the value of the Index in effect on the last business day preceding the day the Bank receives my request for a fixed Daily Periodic Rate. The Margin will be eight percentage points (8.000%), but the Margin may be lower than eight percentage points (8.000%) depending upon the balance amount and remaining term and other pricing indicators that exist at the time you receive my request for a fixed Daily Periodic Rate. The Annual Rate Cap for Line of Credit Advances does not apply to this one time request. The corresponding ANNUAL PERCENTAGE RATE will not be higher than the Lifetime Rate Cap for Line of Credit Advances shown above in Section 4. The ANNUAL PERCENTAGE RATE does not include costs other than interest. I may request conversion to a fixed Daily Periodic Rate by calling the number on my billing statement.

## MY TOTAL PAYMENT DUE DURING THE REPAYMENT PERIOD

I must pay at least the amount of the Total Payment Due by the Date Due, as shown on each monthly billing statement.

The "Total Payment Due" during the Repayment Period is the total of my Fixed Rate Advance Minimum Monthly Payment(s) still due as the result of Fixed Rate Advances in effect on the day before the end of the Draw Period, plus the Line of Credit Advances Balance Minimum Monthly Payment as described above, together with all past due amounts, overlimit amounts and all other charges due. I must pay any remaining balance in full at the end of the Repayment Period.

## SECTION 6: OTHER FINANCE CHARGES

In addition to paying periodic FINANCE CHARGES, as described in Sections 4 and 5 above, I also agree to pay the following additional fees, each of which is a **FINANCE CHARGE:**

## ANNUAL FEE

Beginning on the first anniversary of the Effective Date, and continuing at each anniversary thereafter during the Draw Period, whether or not I use the Account, I will pay a $75.00 non-refundable annual fee. I will not have to pay an annual fee if my Account is open (has not been closed or suspended under Section 16 or 17 below) and the average daily balance in my Account is $20,000 or greater for the 12 monthly billing cycles up to and including my anniversary month. For the purpose of making this determination, the Bank will add the average daily balances for Line of Credit Advances and Fixed Rate Advances from the previous 12 monthly billing cycles and divide the total by 12.

## SECTION 7: ADDITIONAL OTHER FINANCE CHARGES AND CLOSING COSTS

I agree to pay upon the opening of my Account the other FINANCE CHARGES and other charges that are enumerated and disclosed on the attached Statement of Fees, Charges, and Disbursements Addendum which is integrated by reference into this Agreement.

## SECTION 8: ADDITIONAL FEES, COSTS AND CHARGES

In addition to the FINANCE CHARGES and closing costs described above, I agree to pay the following non-refundable fees, costs and charges, which will be owed once charged to my Account.

### LATE CHARGES

During the Draw Period, I will pay a late charge equal to the greater of five dollars ($5.00) or five percent (5%) of the Line of Credit Minimum Monthly Payment if my payment is more than 10 days past due.

During the Repayment Period, I will pay a late charge equal to the greater of five dollars ($5.00) or five percent (5%) of the sum of all Fixed Rate Advance Minimum Monthly Payments and the Line of Credit Advances Balance Minimum Monthly Payment if my payment is more than 10 days past due.

### PREPAYMENT FEE

I agree to pay a prepayment fee of $400.00. This fee will be due and payable in full at any time within the first 3 years after the Effective Date if I close my Account (for any reason other than default due to non-payment, casualty loss, refinance with you or your affiliate, or termination by the Bank). If my Account remains open (is not closed or suspended under Section 16 or 17 below) for more than 3 years after the Effective Date, no prepayment fee will be assessed. No tender of a prepayment of all amounts due under this Agreement shall be effective unless and until such prepayment is accompanied by the applicable prepayment fee.

### OTHER CHARGES

To the extent allowed by law, I agree to pay the following fees if I request or authorize these additional services:

(a) **Fax Fee:** The Bank will charge a fax fee in the amount of $10 if I request or authorize others to request any document or letter to be transmitted by facsimile (fax) machine.

(b) **Research Fee and Photocopy Fee:** The Bank will charge a research/photocopy fee in the amount of $5 per photocopy if I request or authorize others to request that the Bank research my Account or provide photocopies of Account documents for any purpose other than a billing error inquiry.

(c) **Reconveyance or Satisfaction Fee:** The Bank will charge reconveyance and satisfaction fees as allowed by applicable law.

(d) **Stop Payment Fee:** The Bank will charge a stop payment fee in the amount of $25 if I request or authorize others to request that the Bank stop payment on a draft I have used to request a Line of Credit Advance.

(e) **Return Payment Fee:** The Bank will charge a return payment fee in the amount of FORTY AND 00/100THS dollars ($40.00) if I make a payment with a check, or by any other method, which is not honored for any reason. If a payment check or any other payment item is dishonored, the Bank will notify me through information included in my billing statement covering the period in which the returned check or other payment item is reversed against my Account.

(f) **Overlimit Fee:** The Bank will charge an overlimit fee in the amount of $25 for each billing cycle in which I have exceeded my credit limit or have requested an Advance that would have caused me to exceed my credit limit.

(g) **Return Advance Check Fee (insufficient funds):** The Bank will charge a return advance check fee in the amount of $25 for each check or draft used to request a Line of Credit Advance that is returned unpaid (dishonored) by the Bank due to the requested Advance not meeting all requirements of this Agreement.

## SECTION 9: COLLECTION COSTS AND ATTORNEY'S FEES

If I am in default, I will pay the Bank's collection costs, attorney's fees and other expenses of enforcing the Bank's rights under this Agreement and the Security Instrument, unless prohibited by applicable law.

## SECTION 10: METHOD OF PAYMENT

The Bank will provide me with a monthly billing statement and automatically charge my qualified deposit account (under the terms of a separate written Authorization for Automatic Transfer) for the Total Payment Due. If I owe other charges (other than annual fees), I must pay them separately. If I owe past due amounts on my Account, the Bank will not collect these amounts by using an Automatic Payment, and I must pay them separately.

## SECTION 11: SCHEDULED PAYMENT DUE DATE

My monthly payment due date for my Total Payment Due is the 15th day of each and every month during both the Draw and Repayment Periods.

## SECTION 12: MY PROMISE TO PAY

I promise to pay to the order of the Bank the total of all Advances which I receive or which I authorize to be made from my Account. I promise to pay the total of any FINANCE CHARGE, plus all amounts past due, overlimit amounts, and any late charges, fees, other charges and other obligations charged to my Account under this Agreement or the Security Instrument. All payments made under this Agreement will be made in U.S. Dollars. I will not mail any cash payments to the Bank. I may not take an Advance or use funds from an Advance to make payments on my Account.

The Bank may, at its discretion, withhold a portion of the available credit on my Account up to the amount of any payment in order to assure that my check or other payment is honored.

I will make payments at the Bank's address for receiving a payment, as indicated on my payment coupon and billing statement, unless another payment method is authorized by the Bank, in which case my payment must conform to the Bank's requirements for the other payment method as specified in my billing statement. Each non-electronic payment I make will be accompanied by the remittance portion of my billing statement.

I will not make payment or authorize others to make payment for me by means of a single aggregated payment, which includes payments for this Account and any other account(s), unless the payment is made in compliance with the Bank's requirements for multiple account payments.

The Bank may accept late payments, partial payments, post-dated checks, or any form of payment containing a restrictive endorsement, without losing any of the Bank's rights under this Agreement. The Bank's acceptance of checks or money orders labeled "payment in full," or words to that effect, will not constitute an accord and satisfaction nor a waiver of any rights the Bank has to receive full payment. If I intend to condition a payment, pay the Account in full with less than the total amount owed, or give payment instructions, I will clearly set out such intention, conditions and instructions in a separate letter accompanying my payment, and mail both to Wells Fargo Bank, N.A., P.O. Box 2993, Portland, OR 97208.

## SECTION 13: TAX DEDUCTIBILITY

I understand that I should consult a tax advisor regarding the deductibility of interest and charges under my Account.

## SECTION 14: REEVALUATION OF CREDIT QUALIFICATIONS AND CREDIT REPORTS

My signature on this Agreement authorizes the Bank to obtain credit information about me, including credit bureau reports, at any time. Such credit bureau reports may be requested or used in connection with (a) renewal or extension of this Agreement, (b) review of my Account, (c) taking any collection action, or (d) any other legitimate purposes associated with my Account. I agree to submit current financial information to the Bank upon the Bank's request. The Bank may reexamine my credit qualifications at any time. The Bank may report its experience with me and my Account to others, to the extent allowed by law.

## SECTION 15: PAYOFF BALANCE INFORMATION

The Bank will tell me the balance required on any given day to pay off my Account in full, if I so request. If such request is made, including if the request is made by an escrow holder, settlement agent or other third party on my behalf during the Draw Period, the Bank may immediately freeze my Account. I agree that the Bank's receipt of such a request from me, an escrow holder, settlement agent or other third party on my behalf will be considered to be a request by me to suspend credit privileges on my Account. While my Account is frozen, I cannot receive new Advances and the Bank will return unpaid any Advance request checks the Bank receives and will refuse to honor any other Advance request made on my Account. To reactivate the Advance feature on the Account during the Draw Period, the Bank must receive written confirmation from the escrow holder, settlement agent or other third party on my behalf that the escrow or other settlement has been cancelled; further, all Borrowers must sign a written request and send it to the address indicated on my monthly billing statement.

## SECTION 16: DEFAULT

I will be in default if (a) I fail to meet the repayment terms of this Agreement for any outstanding balance, or (b) there is fraud or material misrepresentation by me in connection with this Agreement, or (c) any action or inaction by me adversely affects the Bank's security in the Property, including without limitation, transfer of the Property without the Bank's consent, failure to maintain required insurance or pay required taxes, revocation or termination of any revocable trust that is an owner of the Property, or the death of any person who has signed this Agreement, or (d) I am an executive officer of the Bank and federal law governing credit extended by a bank to its executive officer, including without limitation Section 215.5(d)(4) of Federal Reserve Regulation O (12 CFR § 215.5(d)(4)), permits or requires immediate payment of my entire Account balance.

If I am in default, the Bank, subject to applicable law, may do any or all of the following: (a) close my Account immediately, without notice; (b) return unpaid any outstanding Advance request checks drawn on my Account and refuse to honor any other Advance request made on my Account; and (c) require immediate payment of the entire balance of my Account, and, if I fail to pay, exercise the Bank's rights under the Security Instrument, which may result in the loss of the Property. All remedies are distinct, cumulative and not exclusive, and the Bank is entitled to all remedies provided at law or equity, whether or not expressly set forth. If I am in default, the method of determining the Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE will remain as described in this Agreement.

The Bank and I agree that notwithstanding any other provision of this Agreement or the Security Instrument, the Bank will have the right to terminate or suspend my Account to the extent permitted by applicable law.

## SECTION 17:  CLOSURE OR SUSPENSION OF ACCOUNT, REDUCTION OF CREDIT LIMIT; REINSTATEMENT OF CREDIT

### CLOSURE OR SUSPENSION OF ACCOUNT, REDUCTION OF CREDIT LIMIT BY BORROWER

Any one Borrower can close the Account by paying in full and sending a signed letter to the Bank at the address indicated on my monthly billing statement requesting that the Account be closed.  Any one Borrower may request a suspension of the Advance feature, at any time during the Draw Period.  Except when a Borrower requests a suspension of the Advance feature in connection with a Borrower-initiated request to modify the Account (for example, in connection with a Borrower's request for an interest rate reduction, extension, or other forbearance, or a request that the Bank subordinate its lien), the Borrower's request must be in writing, signed by a Borrower, and sent to the Bank at the address indicated on my monthly billing statement.  To reactivate the Advance feature on the Account during the Draw Period, the Bank will require all Borrowers to sign a written request and to send it to the address indicated on my monthly billing statement.

### CLOSURE OR SUSPENSION OF ACCOUNT, REDUCTION OF CREDIT LIMIT BY BANK

I will receive a written notice if the Bank suspends or freezes my Account or reduces my credit limit as required under applicable law.  The notice will include the reason(s) for such action(s).  Thereafter, if I wish to reinstate my Account or increase my credit limit, I agree to send a written request to the Bank at the address specified on my monthly billing statement, signed by all of the Borrowers, along with satisfactory evidence to the Bank that the reason(s) for suspension or reduction of my Account no longer exist(s).  I also agree to provide the Bank promptly with any additional information necessary to support my request.

The Bank may suspend the use of my Account and temporarily prohibit future Advances during the Draw Period, or the Bank may reduce my credit limit, for any reason permitted by applicable law, including without limitation, (a) if the annualized Daily Periodic Rate equals or exceeds the Lifetime Rate Cap stated herein, (b) there is any material change in my financial circumstances that the Bank reasonably believes will make me unable to fulfill my repayment obligations under this Agreement, (c) the value of the Property declines significantly below its original appraised value, as determined by the Bank, (d) my failure to comply with any material obligation under this Agreement or the Security Instrument, (e) a regulatory authority has notified the Bank that continued Advances would constitute an unsafe and unsound business practice, (f) I am in default under Section 16 above, or (g) government action prevents the Bank from imposing the ANNUAL PERCENTAGE RATE provided for in this Agreement or impairs the Bank's security interest in the Property, such that the value of the security interest is less than 120 percent of the credit limit.

In the event of a suspension of my Account, the Bank is authorized to obtain such information as may be required by the Bank, including without limitation, credit reports and appraisals of the Property, to evaluate any request by me to reinstate the Account.  To the extent permitted by applicable law, I agree to pay to the Bank the cost of obtaining such additional information.

If my Account is closed or suspended for any reason, the Bank may return unpaid any outstanding Advance request checks drawn on my Account and refuse to honor any other Advance request made on my Account.  I will continue to be responsible for full payment of the balance of my Account as well as all other Account obligations, according to the terms of this Agreement.

## SECTION 18: FURTHER ASSURANCES

I agree that I will take any steps, including but not limited to, signing, filing or recording any documents, which are necessary or which the Bank deems appropriate, to be sure that my obligations to the Bank under this Agreement are accurate, valid and enforceable, and become and continue to be secured by the Security Instrument.

## SECTION 19:  CHANGE IN RESIDENCE OR OWNERSHIP OF THE PROPERTY

I agree to notify the Bank immediately if (a) the Property is my primary residence and I cease to live in the Property as my primary residence, or (b) there is any change in the ownership of the Property.  I agree that my Account shall be closed and that the entire outstanding balance of my Account shall be due and payable immediately on any sale or other transfer of the Property, unless prohibited by applicable law.  In this regard, I understand that my Account is secured by a Security Instrument containing the following or a substantially similar provision:

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

> If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## SECTION 20:  CHANGE IN TERMS

To the extent allowed by law, I agree that the Bank may make certain changes to the terms of this Agreement at specified times or upon the occurrence of specified events.  The Bank may make insignificant changes, such as changes in the address for payments, billing cycle dates, payment due dates, day of the month on which Index values are determined, Index or interest rate rounding rules, and balance computation method (if the change produces an insignificant difference in the interest or FINANCE CHARGE I am required to pay).  The Bank may also make changes that will benefit me, such as additional options or a temporary reduction in rates or fees.  In accordance with federal law, the Bank may also change the Index and Margin used to determine the ANNUAL PERCENTAGE RATE(S) that apply to my Line of Credit Advances and/or Fixed Rate Advances if the original Index is no longer available.  The Bank may make any of the changes discussed above without my consent, unless applicable law provides otherwise.  The Bank will give me any notice of change that is required by law.  I may also agree to changes in writing.

## SECTION 21:  WAIVERS

### BORROWER'S WAIVERS
I waive my rights to require the Bank to do certain things.  Those things are:  (a) to demand payment of amounts due (known as "presentment"); (b) to give notice that amounts due have not been paid (known as "notice of dishonor"); (c) to obtain an official certification of nonpayment (known as "protest").  Anyone else who agrees to keep the promises made in this Agreement, or who agrees to make payments to the Bank if I fail to keep my promises under this Agreement, or who signs this Agreement to transfer it to someone else, waives these rights.  These persons are known as "guarantors, sureties and endorsers."

### BANK'S NON-WAIVER
The Bank may fail to make use of any of its rights under this Agreement or the Security Instrument or under applicable law on one or more occasions, or delay or partially exercise such rights, without waiving any of its rights or amending any of my obligations.  The Bank may fail to make use of any of its rights or delay or partially exercise such rights against one party, without waiving any of its rights against any other party to this Agreement.

## SECTION 22:  GOVERNING LAW; SEVERABILITY

All interest, fees and other amounts charged or accruing in connection with this Agreement which are considered "interest" within the meaning of Section 85 of the National Bank Act (12 USC § 85; 12 CFR 7.4001(a)) shall be governed by and interpreted under South Dakota law.  In all other respects, this Agreement and all related documents, as well as the rights, remedies, and duties of the Bank and the Borrower(s), shall be governed and interpreted by federal law with respect to national banks and, to the extent not preempted by federal law, the laws of the state in which the Property is located.

If any provision of this Agreement or the Security Instrument is determined to be invalid or unenforceable by a court of competent jurisdiction, the rest of this Agreement will remain in full force and effect and enforceable according to its terms. All references in this Agreement to the singular shall include the plural and vice versa.

## SECTION 23: LOST OR STOLEN ADVANCE REQUEST CHECKS; BILLING ERRORS

### LOST OR STOLEN ADVANCE REQUEST CHECKS (WHERE AVAILABLE); BILLING ERRORS

I will immediately contact the Bank at the phone number on my monthly billing statement and confirm by letter if any of my Advance request checks are ever lost or stolen, if there are any errors in my monthly billing statement, or if I suspect any unauthorized use of my Account.

The Bank will not return to me my cancelled Advance request checks or other Advance request instruments after paying them. The Bank will make available photocopies of my Advance request checks and other Advance request instruments upon request. I will examine my Account statements promptly in order to identify any improper or unauthorized entries. In consideration for the Bank's payment of each Advance request check, I agree that even though I will not receive the original Advance request checks, all time periods under the Uniform Commercial Code (UCC) for examining my monthly billing statement and reporting improper entries, including the UCC's statutes of limitation with respect to forged, unauthorized, or missing signatures or endorsements, will begin from the time my Account statement is first sent or made available to me.

### UNAUTHORIZED TRANSACTIONS

I will notify the Bank if someone has transferred, or may transfer money from my Account without my permission, or if I suspect any fraudulent activity on my Account. I can call the Wells Fargo Phone Bank at the telephone number on my monthly billing statement, anytime, 24 hours a day, 7 days a week, or advise my local Bank branch office. I may also send written notice to the Bank at the address indicated on my billing statement.

### Billing Rights - Keep This Notice For Future Use

This notice contains important information about my rights and the Bank's responsibilities under the Fair Credit Billing Act.

#### Notify The Bank In Case Of Errors Or Questions About My Bill

If I think my billing statement is wrong, or if I need more information about a transaction on my billing statement, I will send a letter on a separate page to the Bank at the address listed on my billing statement. Write to the Bank as soon as possible. The Bank must hear from me no later than 60 days after the Bank sent me the first billing statement on which the error or problem appears. I can telephone the Bank, but doing so will not preserve my rights.

In my letter, I will provide the Bank with the following information:

- My name, Account number and daytime phone number, and
- The dollar amount of the suspected error, and
- A description of the error and explanation, if possible, as to why I believe there is an error. If I need more information, I will describe the item I am not sure about.

If I have authorized the Bank to pay my Account automatically from my savings or checking account at the Bank, I can stop the payment on any amount I think is wrong. To stop the payment, my letter must reach the Bank at least three business days before the automatic payment is scheduled to occur.

#### My Rights And The Bank's Responsibilities After Receipt Of My Written Notice

The Bank must acknowledge my letter within 30 days, unless the Bank has corrected the error by then. Within 90 days, the Bank must either correct the error or explain why the Bank believes the billing statement was correct.

After the Bank receives my letter, the Bank cannot try to collect any amount I question, or report me as delinquent. The Bank can continue to bill me for the amount I question, including finance charges, and the Bank can apply any unpaid amount against my credit limit. I do not have to pay any questioned amount while the Bank is researching my Account, but I am still obligated to pay the parts of my bill that are not in question.

If the Bank finds that a mistake was made on my billing statement, I will not have to pay any finance charges related to the questioned amount. If the Bank didn't make a mistake, I will have to pay finance charges, and I will have to make up any missed payments on the questioned amount. In either case, the Bank will send me a statement of the amount I owe and the date that payment is due.

If I fail to pay the amount that the Bank thinks I owe, the Bank may report me as delinquent. However, if the Bank's explanation does not satisfy me and I write to the Bank within ten days telling the Bank that I still refuse to pay, the Bank must tell anyone the Bank reports me to that I have a question about my bill. And, the Bank must tell me the name of anyone the Bank reports me to. The Bank must tell anyone the Bank reports me to that the matter has been settled when it finally is.

If the Bank does not follow the above rules, the Bank cannot collect the first $50 of the questioned amount, even if my billing statement was correct.

## SECTION 24: NOTICES

Unless applicable law requires a different method, any notice that must be given to me or to anyone else who signs, guarantees or endorses this Agreement  may be given by mailing it to my address as set forth above in this Agreement, or to a different address if I have properly notified Lender of that different address. I understand that I am responsible for promptly notifying Lender of a change in my name, address (including the email address(es) I use for online banking with Lender and any other email address(es) at which I agree to be contacted) or telephone number(s) (including any wireless telephone number(s) at which I agree to be contacted). Any notice that I may send to Lender must be given by mailing it to Lender at the address provided on my billing statement, unless the type of notice is more specifically addressed in this Agreement and a different address is provided herein.

From time to time, Lender may monitor and record telephone calls regarding my account to assure the quality of its service. I agree, in order for Lender to service the account or to collect any amounts I may owe, that Lender or its designated representatives may from time to time make calls and/or send e-mails and/or text messages to me, sometimes using prerecorded/artificial voice messages and/or through the use of an automatic dialing device, at any telephone number associated with my account, including wireless telephone numbers that could result in charges to me, or at any e-mail address I provide to Lender.

**SECTION 25:  ADDENDA**

I agree to the following attached addenda, modifications or amendments:

Statement of Fees, Charges and Disbursements Addendum
N/A

**SECTION 26:  STATE DISCLOSURES**

N/A

THIS AGREEMENT, THE SECURITY INSTRUMENT AND THE CLOSING DOCUMENTS EXECUTED HEREWITH CONSTITUTE A WRITTEN LOAN AGREEMENT WHICH REPRESENTS THE FINAL AGREEMENT OF THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES RELATING TO THIS AGREEMENT.

**NOTICE TO THE BORROWER**
**DO NOT SIGN THIS AGREEMENT IF IT CONTAINS BLANK SPACES.  ALL SPACES SHOULD BE COMPLETED BEFORE THIS AGREEMENT IS SIGNED.   READ THIS AGREEMENT BEFORE SIGNING IT.**

## ACKNOWLEDGMENT

I have received, read and retained a copy of this *Wells Fargo Home Equity Account* Agreement and Disclosure Statement (the "Agreement"), the Security Instrument, the Agreement to Provide Insurance, and the Statement of Fees, Charges, and Disbursements Addendum provided to me at the closing, all of which I agree to by signing this Agreement. The Statement of Fees, Charges, and Disbursements Addendum is incorporated into and made a part of this Agreement. I acknowledge receipt of the *Wells Fargo Home Equity Account* Important Terms disclosure and the home equity brochure when I applied for this Account. In addition, I hereby agree that the terms of this Agreement replace the terms of any prior oral or written agreements between the Bank and me about this Account, including, for example, any and all commitment letters and pre-approval letters between the Bank and me about this Account.

_____        1/7/16
BORROWER                                                                                          DATE SIGNED
CAROL WAGGENER

Lender Name: Wells Fargo Bank, N.A.   NMLSR ID ▮▮▮▮
Loan Originator's Name: Anna Maria Moryl
NMLSR ID ▮▮▮▮
Wells Fargo Home Equity Account Agreement HE105011.
(11/14/2015   ▮▮▮▮                                 16/16
                                     Documents Processed 01-05-2016 15:34:01

# EXHIBIT "B"

For Registration J. David Granberry
Register of Deeds
Mecklenburg County, NC
Electronically Recorded
2016 Jan 20 10:14 AM        RE Excise Tax: $ 0.00
Book: 30546        Page: 120        Fee: $ 56.00
Instrument Number:

*J. David Granberry* (signature)

After Recording Return To:
Wells Fargo Bank, N.A.
Attn: Document Mgt.
P.O. Box 31557
MAC B6955-013
Billings, MT 59107-9900

This Instrument was prepared by:
Wells Fargo Bank, N.A.
TANYA B GRAY
DOCUMENT PREPARATION
7711 PLANTATION RD
ROANOKE, VA 24019
1-866-537-8489

AFTER RECORDING, RETURN TO:
AMERICAN TITLE, INC.
P.O. BOX 641010
OMAHA, NE 68164-1010

---

**[Space Above This Line For Recording Data]**

Reference number:                                        Account Number:
Parcel Identification number:

### SHORT FORM OPEN-END DEED OF TRUST
### (Securing Future Advances under a Home Equity
### Line of Credit Subject to Article 9, Chapter 45
### of the North Carolina General Statutes)

**DEFINITIONS**

Words used in multiple sections of this document are defined below. The Master Form Deed of Trust includes other defined words and rules regarding the usage of words used in this document.

**(A) "Security Instrument"** means this document, which is dated <u>January 07, 2016</u>, together with all Riders to this document.
**(B) "Borrower"** is <u>CAROL WAGGENER, AN UNMARRIED PERSON.</u>. Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is <u>Wells Fargo Bank, N.A.</u> Lender is a National Bank organized and existing under the laws of the United States of America. Lender's address is <u>101 North Phillips Avenue, Sioux Falls, SD 57104</u>. Lender is the beneficiary under this Security Instrument.

Submitted electronically by "American Title - Team 1"
in compliance with North Carolina statutes governing recordable documents
and the terms of the submitter agreement with the Mecklenburg County Register of Deeds.

8/17/2021

**(D)** "**Trustee**" is Wells Fargo Financial National Bank.

**(E)** "**Debt Instrument**" means the loan agreement or other credit instrument signed by Borrower and dated January 07, 2016. The Debt Instrument states that Borrower owes Lender, or may owe Lender, an amount that may vary from time to time up to a maximum principal sum outstanding at any one time of, ONE HUNDRED TWENTY FIVE THOUSAND AND 00/100THS Dollars (U.S. $125,000.00) plus interest. Borrower has promised to pay this debt in Periodic Payments and to pay the debt in full not later than seven (7) calendar days after February 07, 2046.

**(F)** "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)** "**Loan**" means all amounts owed now or hereafter under the Debt Instrument, including without limitation principal, interest, any prepayment charges, late charges and other fees and charges due under the Debt Instrument, and also all sums due under this Security Instrument, plus interest.

**(H)** "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [mark as applicable]:

    N/A Leasehold Rider
    N/A Third Party Rider
    N/A Other(s) [specify] _____ N/A _____

**(I)** "**Master Form Deed of Trust**" means the Master Form Open-End Deed of Trust dated n/a, and recorded on n/a, as Instrument No. n/a in Book n/a at Page n/a in the Office of the Register of Deeds of Mecklenburg County, State of North Carolina.


TRANSFER OF RIGHTS IN THE PROPERTY

        This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all future advances, renewals, extensions and modifications of the Debt Instrument, including any future advances made at a time when no indebtedness is currently secured by this Security Instrument; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Debt Instrument. For this purpose, Borrower irrevocably grants and conveys to Trustee and Trustee's successors and assigns, in trust, with power of sale, the following described property located in the

| County | of | Mecklenburg | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

SEE ATTACHED EXHIBIT A

which currently has the address of

| 128 WONDERWOOD DRIVE |
| [Street] |

| CHARLOTTE | , North Carolina | 28211 | ("Property Address"): |
| [City] | | [Zip Code] | |

NORTH CAROLINA-SHORT FORM OPEN-END SECURITY INSTRUMENT

TO HAVE AND TO HOLD this property unto Trustee and Trustee's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." The Property shall also include any additional property described in Section 20 of the Master Form Deed of Trust.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record as of the execution date of this Security Instrument. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

## MASTER FORM DEED OF TRUST

By the execution and delivery of this Security Instrument, Borrower agrees that all of the provisions of the Master Form Deed of Trust are hereby incorporated in their entirety into this Security Instrument. Borrower agrees to be bound by and to perform all of the covenants and agreements in the Master Form Deed of Trust. A copy of the Master Form Deed of Trust has been provided to Borrower.

BY SIGNING UNDER SEAL BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it. Borrower also acknowledges receipt of a copy of this document and a copy of the Master Form Deed of Trust.

_____    _____ (Seal)
CAROL WAGGENER                                                                  - Borrower

Lender Name:  Wells Fargo Bank, N.A.   NMLSR ID:

Loan Originator's Name: Anna Maria Moryl
NMLSR ID:

For An Individual Acting In His/Her Own Right:
NORTH CAROLINA, _Mecklenburg_ COUNTY.

I _Amanda Marshall_, a Notary Public of the State of
_North Carolina_, do hereby certify that

CAROL WAGGENER

personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and notarial seal on this the _7_ day of _January_, 20_16_

Print Name: _Amanda Marshall_
Notary Public

My commission expires: _05/15/19_

NORTH CAROLINA-SHORT FORM OPEN-END SECURITY INSTRUMENT

8/17/2021